UNITED STATES of America

v.

Daniel Thomas DePEW, Jr.

Crim. No. 90–00017–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

May 18, 1990.

Neil Hammerstrom, Asst. U.S. Atty., Alexandria, Va., for U.S.

James M. Lowe, Alexandria, Va., for De-Pew.

## SENTENCING MEMORANDUM AND ORDER

ELLIS, District Judge.

### Introduction

Defendant Daniel Thomas DePew, Jr. is before the Court for sentencing after a jury trial on March 28, 1990 to Counts I and II of an Indictment charging defendant with Conspiracy to Kidnap in violation of 18 U.S.C. § 1201(c), and Conspiracy to Sexually Exploit a Child in violation of 18 U.S.C. § 371.

The trial record reflects a tale of unspeakable evil and tragedy narrowly averted. Defendant conspired with Dean Ashley Lambey to kidnap a young male child for the purpose of sexually abusing the child. They planned to film these events and market the film. Convincing tape recorded evidence leaves no doubt that defendant and Lambey intended to carry out their plan. As it happened, however, two undercover agents posed as co-conspirators and their testimony, together with various taped conversations and telephone calls, established the existence, nature and purpose of the conspiracy. This circumstance averted a tragedy that might well have occurred.

Lambey, defendant and the undercover agents met originally through computer bulletin board services designed, apparently, to facilitate contact among persons seeking diverse and deviant sexual pursuits, including homosexual pedophilia. As a result of the parties' initial contact and subsequent encounters by computer and in person, the undercover agents learned that defendant was interested in producing a video depicting the sexual exploitation and murder of a minor. Defendant explained to Lambey and the undercover agents that he would be willing to "tie the kid up, suffocate him, and beat him on film" and that he "had no problem with snuffing [killing]" him. Defendant also expressed his desire to tie a plastic bag over the child's head, hang him, have sex with him, and watch him struggle. Defendant offered suggestions about how to dispose of the victim at the completion of the film, including dousing the body with muriatic acid to disfigure it and dumping it in a remote area of the woods. In connection with the child's abduction, defendant researched how to manufacture ether for use in subduing the child. During the planning of this crime, defendant described previous incidents in which he had attempted to molest and kill a sixteen or seventeen year old American boy in Greece and a boy from D.C. who "looked about fifteen." The following excerpts from taped conversations of defendant's planning of the crime vividly illustrate defendant's role in the conspiracy:

*Segment I*

*Defendant:* ... Well, actually my main interest is in doing the snuffing. Uh, after it's one once reached the point that ... then I can have my own fun and go my own way, you know, that I can start in to put—and the result of of mine, will ... will most likely be the ... the poor boy will cease to exist.

*Agent:* Do you ... you have an age preference?

*Defendant:* Um, I can go down ... down near, Dave is talking twelve.

*Agent:* Yeah.

*Defendant:* I can go down to twelve easy.

*Agent:* Um hum.

*Defendant:* I ... thirteen or fourteen is more along my line, since they're a little bit bigger and they can take a fist a little bit easier ...

*Segment II*

*Defendant:* He has to discuss it with you, uh ... to find the appropriate ending. Uh, my fetishes are that I want to strangle the kid. I also want to hang the kid. I want to suffocate the kid. I want to force him to breathe ... to smoke cigars. Uh ...

*Agent:* Smoke cigars?

*Defendant:* Yeah, I've got strange fetishes, okay?

*Agent:* Okay.

## Segment III

*Defendant:* Uh, but you know, if he wanted to see some blood, I'd cut the kid's balls and cock off and shove 'em down his throat and continue on my merry way and let him sit there and bleed while I had fun too.

## Segment VI

*Defendant:* Uh, my suggestion for the disposing of the body after everything was done, depending on what we've done, we've done, whether it be drowning or what not, is to take some sort of caustic substance and ... a real good strong paint remover is the best ... and pour it over the kid and wrap him up in plastic. See, Dave wants the kid identified, is what he told me. Uh ...

*Defendant:* But you can any sort of thing from the car ... car parts store or just plain old paint remover that you ... dump over the kid ... any source of fibers ... left outside his body ... are dissolved off and on some of the stuff, if he's at least left there overnight, his fingerprints and what not will start to dissolve anyway. And he will decompose much faster.

## Segment VII

*Defendant:* I would dispose of the uh ... in a swamp ... called Zekiah Swamps it's in Maryland. It's in what is currently not a very populated spot, uh ... and there's a state road that goes through there. And a couple of bridges and what not. And I'd soak the kid down with some sort of solvent or what not in a bathtub.

*Defendant:* I'd soak him down in the bathtub and while he's still covered with the gunk, I'd go ahead and wrap him in a roll of sheet plastic, which you can buy at Hechinger for two dollars and thirty-five cents, and I'd take him down to Zekiah Swamp and dump him in Zekiah Swamp and he's just gonna float down into the swamp and someone finds him ...

Conversation recorded July 17, 1989, 7:03 pm.

## Segment V

*Defendant:* Well, I saw a little blond boy last night ... had to have been somebody with a van ready to like, throw open the door, I would've run up and snatched him off of his uh ... his ... his ... skateboard.

Conversation recorded July 21, 1989, 1:45—5:15 pm.

Pursuant to 18 U.S.C. § 3553, the Court sets forth the following findings and reasons in connection with the sentence imposed on defendant.

### A. *Uncontested Matters:*

With the exception of the matters listed below, the government and defendant have no objection to the Presentence Investigation Report ("PSIR"). Accordingly, with the exception of those matters, the Court adopts the findings and conclusions of the PSIR as its findings and conclusions in this sentencing proceeding.

In addition, and without objection by the government, the Court ORDERS the following letters to be made a part of the PSIR:

1. Letter, dated April 7, 1990, to Judge Ellis from defendant.

2. Letter to whom it may concern, dated May 3, 1990, from Lawrence A. Coen.

3. Letter, dated May 12, 1990, to Judge Ellis from The Rev. Dr. Edgar D. Romig.

Also uncontested by the government is defendant's request to make defendant's health information, provided under seal pursuant to Rule 32(c)(3)(A), Fed.R.Crim.P., a part of the PSIR. The Court so orders.

### B. *Contested Matters:*

█ Defendant generally objects to the PSIR's characterization of his offense conduct. Defendant maintains that his statements and actions were merely part of a sexual fantasy and that he never intended to realize his plan or to commit any crime. The Court rejects this contention. Ample record evidence supports the jury's conclu-

sion that defendant's actions were genuine and not the product of an intricate fantasy.

Beyond defendant's general objection, he also raises four objections to the PSIR's conclusions. Each is separately discussed.

■ (1) First, defendant contends that the Probation Officer's Guidelines analysis is fundamentally flawed because he uses § 2X1.1 as the starting point for the offense level calculation. Defendant argues that § 2X1.1 is inapposite as it "applies only in the absence of a more specific guideline." U.S.S.G. § 2X1.1, Application Note 1. In defendant's view, the correct starting point should have been § 2A2.1, the section pertaining to conspiracy to commit murder. Such a starting point, defendant claims, would lead to half the offense level found in the PSIR. Defendant's argument is meritless.

The short answer to defendant's contention is that he was charged and convicted of conspiracy to kidnap, not conspiracy to murder. Given this, the correct starting point for the analysis is § 2X1.1, pertaining to conspiracy.[1] Because § 2X1.1(a) adopts the base offense level from the guideline for the object offense, the Probation Officer correctly referred to § 2A4.1, the section pertaining to kidnapping and abduction. But where, as here, the planned kidnapping was to facilitate another crime, *i.e.*, murder, and where the guideline for the facilitated crime provides for a higher offense level than kidnapping, then § 2A4.1(b)(5)(B) requires the use of the guideline yielding the higher offense level. In this instance, since the kidnapping was planned for the purpose of committing a murder, the Probation Officer correctly referred to § 2A2.1, the guideline for murder. This progression through the Guidelines led the Probation Officer, ultimately and correctly, to the conclusion that an offense level of 43 is appropriate. He then, also correctly, reduced this figure by three levels because § 2X1.1(b)(2) requires such a reduction where, as here, defendant and his co-conspirators did not carry out the conspiracy and achieve its object. Thus, the

Probation Officer arrived at a base offense level of 40. The Court concludes that this base offense level properly characterizes defendant's criminal conduct.

■ (2) Second, defendant contends that the Probation Officer's two level victim-related enhancement is incorrect as there was no identifiable victim. This contention finds no support in the Guidelines Manual. Nothing in § 3A1.1 requires that the victim be specifically identified; the victim-related adjustment properly applies where, as here, the conspirators had identified their victim as a young, approximately ten-year-old male child. No further or more specific identification is required for the application of § 3A1.1.

■ (3) Next, defendant claims he should receive a two-level credit on the ground that he played only a minor role in the offense. This claim is flatly contradicted by the record; defendant's role was anything but minor. As the conspiracy took form, it became clear that defendant wanted to be the individual to torture, sexually abuse and then ultimately murder the child. It was also part of defendant's role to dispose of the child's remains. By no stretch of the imagination can this be said to be only a minor role. Defendant's claim in this regard is frivolous.

(4) Finally, defendant further contends he should receive a two-level credit for acceptance of responsibility. Defendant bears the burden of proving acceptance of responsibility. *United States v. Harris*, 882 F.2d 902, 907 (4th Cir.1989). Defendant has failed to meet this burden; his contention is wholly unconvincing. It rests on defendant's lengthy statements, orally and in writing, to the effect that the conspiracy was, for him, nothing more than a fantasy, that he never really intended to carry out the planned crime and that he continued to participate only because he was afraid of the consequences to him and to his lover were he to back out. The Court categorically rejects these contentions; there is no doubt whatever that de-

---

**1.** Defendant's conviction for Count II, conspiracy to exploit a child sexually, was correctly grouped with Count I for purposes of the Guidelines, pursuant to § 3D1.2(a) and (b).

fendant and Lambey fully intended to carry out their disgusting and heinous scheme.

### C. *Conclusions:*

1. Defendant's adjusted offense level is 42.
2. Defendant's offense level total is 42.
3. Defendant's Criminal History Category is I.
4. The range of punishment under the Guidelines is 360 months to life, with five (5) years of supervised release required.
5. The Guidelines range of fines is $25,000 to $250,000 with an additional statutory special assessment of $50 for each felony count. 18 U.S.C. § 3013(a)(2)(A).
6. Probation is not authorized.

### D. *Motion for Departure:*

█ Defendant seeks a downward departure on two grounds. First, defendant claims that his physical condition—he suffers from AIDS—warrants a downward departure. Second, he argues that his efforts to withdraw from the conspiracy also merit a downward departure. Neither ground supports a departure. Defendant's AIDS affliction warrants sympathy, but not a departure. U.S.S.G. § 5H1.4 provides that "[p]hysical condition is not ordinarily relevant in determining whether a sentence should be outside the guidelines...." Only an "extraordinary physical impairment" may justify a sentence other than imprisonment. *Id.* AIDS is not such a "physical impairment"; nor is cancer or various other terminal or life threatening conditions. *See e.g., United States v. Carey*, 895 F.2d 318 (7th Cir.1990) (fact that defendant is afflicted with cancer, without more, is not an extraordinary physical impairment). The Bureau of Prisons, at FCI Butner and elsewhere, has the medical personnel and facilities required to furnish defendant with the care and treatment he needs. Indeed, defendant is entitled to that care and treatment. *See Estelle v. Gamble*, 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976) (prisoners are constitutionally entitled to receive medical treatment). Similarly, Bureau of Prisons medical personnel and facilities at FCI, Butner and elsewhere are also fully competent to give defendant the psychological counselling he needs. In sum, defendant's physical condition, while lamentable, is no basis for a departure. *See United States v. Kelly*, 905 F.2d 1532 (4th Cir.1990) (unpublished opinion) (must demonstrate extraordinary physical impairment in order to justify a sentence other than imprisonment), *United States v. Carey*, 895 F.2d 318 (7th Cir.1990) (departure under § 5H1.4 requires showing defendant suffers from extraordinary physical impairment). *See also United States v. Ghannam*, 899 F.2d 327 (4th Cir.1990) (extraordinary physical impairment may be a reason to impose a sentence other than imprisonment or to shorten imprisonment). *Cf. United States v. Niemiec*, 689 F.2d 688 (7th Cir.1982) (pre-Guidelines decision suggesting that district judges may reduce sentences of seriously ill defendants). Except in extraordinary circumstances not present here, terminally ill persons who commit serious crimes may not use their affliction to escape prison. Were this rule otherwise, the law's deterrent effect would be unreasonably and unnecessarily diminished in the case of terminally ill persons.

Equally baseless is defendant's argument grounded on his claim of withdrawal from the conspiracy. Withdrawal from a conspiracy must be shown by "evidence that the defendant acted to defeat or disavow the purposes of the conspiracy." *United States v. West*, 877 F.2d 281, 289 (4th Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 377, 107 L.Ed.2d 362 (1989). *See also, United States v. United States Gypsum Co.*, 438 U.S. 422, 464–6, 98 S.Ct. 2864, 2887–88, 57 L.Ed.2d 854 (1978) (defendant must show acts inconsistent with the object of the conspiracy and communicate them in a manner reasonably calculated to reach co-conspirators); *United States v. Lazano*, 839 F.2d 1020, 1023 (4th Cir.1988) (defendant must act to defeat or disavow conspiracy's purpose); *United States v. Urbanik*, 801 F.2d 692 (4th Cir.1986) (same). The burden of establishing withdrawal rests on defendant and is a jury question. *United*

States v. *Walker*, 796 F.2d 43, 49 (4th Cir.1986); *United States v. Urbanik*, 801 F.2d 692 (4th Cir.1986) (same). The jury implicitly found here that defendant did not meet that burden and that he never withdrew from the conspiracy. The Court concurs; indeed, the evidence does not fairly permit a different conclusion. Accordingly, defendant's argument that he withdrew is unfounded.

### E. *Sentence Imposed:*

The Court commits defendant to the custody of the Bureau of Prisons for a period of 400 months on Count I, and a term of 60 months on Count II. Both terms to run concurrently. On release from confinement, the defendant is to serve a period of five (5) years of supervised release with respect to Count I and three (3) years of supervised release as to Count II. These terms also are to run concurrently.

The Court imposes a $50 special assessment on each count for a total of $100, pursuant to 18 U.S.C. § 3013(a)(2)(A).

Given defendant's lack of financial assets, the Court declines to impose either a fine or the costs of incarceration or supervised release.

Finally, the Court grants defendant's motion to recommend to the Bureau of Prisons that defendant be incarcerated at the Federal Correctional Institution ("FCI") at Butner, North Carolina. In support of this recommendation, the Court notes that FCI, Butner has the medical personnel and facilities required for the care and treatment of defendant's physical condition. FCI, Butner also has the psychiatric counselling personnel who are already familiar with defendant and his counselling needs. Finally, FCI, Butner has security level adequate for defendant's incarceration. In connection with defendant's physical and mental condition, the Court notes that defendant has tested positive for the AIDS HIV virus and is already in need of treatment and medication for this condition. Moreover, defendant's medical records make clear the compelling need in his case for psychiatric care and counselling.

### F. *Statement of Reasons for the Court's Sentence:*

It is difficult to imagine a crime more heinous than that contemplated and planned by defendant and Lambey. Any sentence less severe than that imposed on defendant would not satisfy the Guidelines' goals relating to deterrence, retribution and incapacitation.

Copies of this Sentencing Memorandum and Order shall be issued to all counsel of record, the Probation Office, the United States Marshal, and to the United States Sentencing Commission.