UNITED STATES of America, Plaintiff–Appellee,

v.

Garland D. THOMAS, Sr., Defendant–Appellant.

No. 93–3867.

United States Court of Appeals, Sixth Circuit.

Submitted June 20, 1994.

Decided March 16, 1995.

David A. Sierleja, Office of the U.S. Atty., Cleveland, OH (briefed), for plaintiff-appellee.

Lawrence J. Whitney, Sr., Burdon & Merlitti, Akron, OH (briefed), for defendant-appellant.

* The Honorable William O. Bertelsman, Chief United States District Judge for the Eastern District of Kentucky, sitting by designation.

Before: JONES and RYAN, Circuit Judges; BERTELSMAN, Chief District Judge.*

RYAN, J., delivered the opinion of the court, in which BERTELSMAN, D.J., joined. NATHANIEL R. JONES, J. (pp. 261–63), delivered a separate dissenting opinion.

RYAN, Circuit Judge.

A jury convicted defendant, Garland Thomas, Sr., on one count of distributing cocaine base, in violation of 21 U.S.C. § 841(a)(1), and one count of possession of cocaine base with intent to distribute, also in violation of 21 U.S.C. § 841(a)(1). Thomas now appeals, raising five assignments of error: whether Thomas's right to a speedy trial was denied; whether the district court erred in admitting into evidence a sawed-off shotgun; whether the district court erred in calculating the quantity of drugs for sentencing purposes; whether the trial court erred in failing to depart downward from the sentencing guidelines; and whether, by prohibiting departures to avoid disparate sentencing, the sentencing guidelines violate the Sixth and Fourteenth Amendments.

We affirm the district court's decision on all five issues.

## I.

On November 25, 1992, Daniel Gain, a confidential informant for the Lake County, Ohio, Narcotics Agency, purchased 220 milligrams of crack cocaine from Thomas. At the time of the purchase, Gain wore a body transmitter and was monitored by members of the Painesville, Ohio, Police Department. Later that same day, Gain purchased another small quantity of crack from Thomas.

On December 3, 1992, Gain contacted Thomas and arranged to purchase one-half ounce of crack. Gain met Thomas in the parking lot of a closed ice cream store, where he completed the transaction and purchased 4.17 grams of crack. Gain was again monitored by officers of the Painesville Police

Department. Immediately after the sale, the officers arrested Thomas, and upon searching him, found an additional 2.15 grams of crack, as well as $550 in cash, a knife, and a pager. The officers transported him to the police station, where the officers read him his rights. Thomas signed a waiver of rights form and agreed to talk to the officers. He told them that he first sold crack approximately three months before his arrest in order to support his drug habit. He admitted that he sometimes used a sawed-off shotgun when selling drugs to protect himself from other dealers. Thomas did not, however, bring the weapon to the December 3 sale. Thomas cooperated with the officers and arranged for them to seize the gun.

On January 21, 1993, a three-count indictment was returned charging Thomas with two counts of distributing crack cocaine, and one count of possession with intent to distribute. On February 2, 1993, a superseding indictment was filed correcting defendant's name, but which, in all other respects, was identical to the original indictment. Thomas was arraigned on February 3, 1993, and entered not guilty pleas as to all counts.

Thomas's trial began April 29, 1993, and was concluded the next day when the jury returned guilty verdicts with respect to Counts 1 and 3, and a not guilty verdict with respect to Count 2. Later, the district court sentenced Thomas to 110 months imprisonment, to be followed by four years supervised release. Thomas now appeals.

## II.

### A. Speedy Trial

The Speedy Trial Act, 18 U.S.C. § 3161 *et seq.*, governs the permissible time lapse between the indictment or first appearance of an accused and his trial. Absent certain circumstances, which are outlined in section 3164, the government must bring a defendant to trial within 70 days. Section 3161(h) mitigates the stringency of this rule by excluding certain dates from the 70–day time frame. If section 3164 applies, the relevant time frame is 90 days, excluding the same days discussed in section 3161(h).

Thomas first contends that he was not brought to trial within the 70 days required by section 3161. The government disagrees and contends that Thomas was tried 69 days after his arraignment. Thomas's first appearance was on February 3, 1993. His trial commenced April 29, 1993. Eighty-four days lapsed during this time period. The dispute in this case is over the number of days that are excludable from the speedy trial clock under section 3161(h).

■ The government argues that fifteen days can be excluded due to pretrial motions. The government, however, arrives at this figure by counting too many days for the motion filed February 12 and the one filed March 15. It is the law in this circuit that only actual days elapsed between the filing of the motion and its disposition are counted. For example, if a motion is filed April 30 and resolved on May 2, two days are excluded from the speedy trial clock. *See United States v. Bowers,* 834 F.2d 607, 609 (6th Cir.1987).

■ This circuit does not include the date a motion was filed in the calculation, unless that date was also the date an order was entered resolving the motion. Thomas filed a pretrial motion on February 12, which was resolved on February 16, for a lapse of four days. Thomas's March 15 motion was resolved on March 16, for a lapse of only one day. Thus, these two motions resulted in five excludable days, as opposed to the government's count of seven. Assuming the government has correctly counted the other days,[1] 71 days elapsed between Thomas's first appearance and the commencement of his trial. Clearly, then, Thomas was not brought to trial within 70 days. Accordingly, to avoid a Speedy Trial Act violation, the

---

1. On February 3, the government moved that Thomas be detained pending trial. The court held a detention hearing on February 8, at which the court issued an oral detention order. The court did not file the written detention order until February 10. Thus, this motion resulted in an excludable time of either five or seven days, depending on whether we count from the motion to the oral order or to the written order. The government counts seven days. We need not address this question.

government must establish that the 90 day clock set forth in section 3164 applies to this case.

Section 3164 provides:

(a) The trial or other disposition of cases involving—

(1) a detained person who is being held in detention solely because he is awaiting trial, and

(2) a released person who is awaiting trial and has been designated by the attorney for the Government as being of high risk,

shall be accorded priority.

(b) The trial of any person described in subsection (a)(1) or (a)(2) of this section shall commence not later than ninety days following the beginning of such continuous detention or designation of high risk by the attorney for the Government. The periods of delay enumerated in section 3161(h) are excluded in computing the time limitation specified in this section.

18 U.S.C. § 3164.

In 1985, Thomas was convicted in a California state court of voluntary manslaughter. He was paroled in 1991, and allowed to relocate to Ohio. On January 20, 1993, after Thomas's arrest on the instant charges, the California Interstate Parole Unit lodged a detainer against Thomas with the U.S. Marshal's Service. Thomas argues that, as a result of this detainer, he was not, with respect to his case, in custody "solely awaiting trial" and, therefore, section 3164 does not extend his speedy trial clock.

The resolution of this issue turns on the answer to two questions. First, what does the language "solely awaiting trial" mean? Second, why would Congress make these cases a "priority" and then create a longer speedy trial clock for them? Very little case law exists on this question. The only possibly relevant case we know of is a Fifth Circuit opinion discussing the relationship between a local "speedy trial" plan (known as the Rule 50(b) plan) and the Speedy Trial Act. The Act apparently became effective sometime during the course of the proceedings against the defendant. The Fifth Circuit stated:

The Government argues that the Speedy Trial Act applies, because it superseded the old Rule 50(b) plan on September 29, 1975, with respect to custodial and high-risk defendants. See 18 U.S.C. § 3164. The difficulty with the Government's argument is that section 3164, insofar as it relates to the instant case, pertains to "detained persons who are being held in detention *solely* because they are awaiting trial." However, one of the reasons for [the defendant's] detention, according to the August 5 magistrate's order, was that there was a request from another district to hold [the defendant] for another crime. Therefore, we cannot say that he was being held *solely* because he was awaiting trial, and we apply the original Rule 50(b) plan.

*United States v. Wyers,* 546 F.2d 599, 601 n. 2 (5th Cir.1977) (citation omitted). The Fifth Circuit case addresses a somewhat different situation than is presented here, and also fails to offer any analysis in support of its conclusion. Most particularly, the detention order in the present case does not mention the California detainer. Thus, we do not find *Wyers* to be very helpful.

Finding no instructive case law, we turn to the legislative history, not because the statute is ambiguous or needs "interpretation" or "construction," but merely to help us to better understand the rationale for Congress's clear but somewhat puzzling command. When the Speedy Trial Act became law in early January 1975, the statute contained different effective dates for various provisions. The 70 day clock did not take effect until July 1, 1976. The purpose of the delay was to allow courts, prosecutors, and defense attorneys time to prepare to implement the new system. Congress was especially concerned, however, with pretrial detainees who were in custody only awaiting trial, and for no other purpose. As a result of this concern, Congress included section 3164 in the Speedy Trial Act. As originally enacted, however, section 3164 was an interim provision. It took effect on October 1, 1975, and created the 90 day clock for pretrial detainees who, if it were not for the pending charges, would not be in custody. This inter-

im 90 day clock lapsed with the effective date of the 70 day clock.

In 1979, Congress passed several amendments to the Speedy Trial Act. One of these amendments struck the "interim" language and the dates from section 3164 and made the 90 day clock permanent for the pretrial detainees described in the statute. Nothing in the legislative history of this amendment explains why Congress took this action. Working from the plain language of the statute, however, as well as the clear congressional intent underlying the original section 3164, we conclude that the existence of the California detainer against Thomas did not remove him from the 90 day clock.

The only reason Thomas was in federal custody was in anticipation of his trial. The federal government had no other reason to hold Thomas, and no state had custody of Thomas between his arraignment and his trial. Should Thomas cease to have been held pending trial, he would have been transferred to the custody of the California state authorities. We do not know what action California would have taken with respect to the detainer, however, as we do not know the nature of the charges underlying that detainer. In any event, regardless of what California would do, it is clear that California could not do anything until the federal government either finished with Thomas or chose to let California have him first. Thus, for all intents and purposes, Thomas was in custody "solely awaiting trial." Accordingly, section 3164 applies and extends Thomas's speedy trial clock to 90 days. As the government brought him to trial within the allotted time, Thomas's speedy trial rights were not violated.

### B. Admission of Shotgun

■ Thomas filed a motion *in limine* objecting to the admission of the sawed-off shotgun that he helped police recover. According to Thomas, the weapon had little relevance because it was not involved in the crimes charged. In addition, Thomas argued that the shotgun would have a substantial prejudicial impact on the jury. The district court admitted the weapon, and Thomas contends on appeal that this ruling was incorrect.

This dispute concerns Fed.R.Evid. 403, which provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

The task of an appellate court in reviewing Rule 403 decisions has been clearly defined:

Under Rule 403 this Court has recognized that "the admission of relevant potentially prejudicial evidence is placed within the sound discretion of the trial court. Such discretion must be exercised by balancing the probative value of the evidence against its prejudicial attributes. If in the discretion of the court the probative value of the evidence is *substantially* outweighed by its prejudicial character, the evidence is inadmissible." Appellate court review of this discretion is limited. We must look at the evidence in the light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect.... "If judicial self-restraint is ever desirable, it is when a Rule 403 analysis of a trial court is reviewed by an appellate tribunal."

*United States v. Zipkin,* 729 F.2d 384, 389–90 (6th Cir.1984) (citations omitted). A district court's decision will not be overturned absent a clear abuse of discretion. *United States v. Seago,* 930 F.2d 482, 494 (6th Cir. 1991).

The probative value of the gun, if any, is quite low. The government contends that it wanted to introduce the weapon because it is a tool of drug dealers and it advances the proposition that Thomas was a dealer, not just a user. The gun, however, was not used in any of the transactions involved in this case. At trial, the government presented tape recordings of conversations conducted during the transactions, the testimony of the officers involved in the case, and the testimony of the confidential informant. In addition, the government introduced the crack purchased by the informant and the crack seized

from Thomas, as well as the $550 in cash, the knife, and the pager taken from Thomas after his arrest. We do not see what the gun adds to the picture, except possibly to inflame the jury regarding the violence often associated with crack dealers.

The government relies primarily on *United States v. Rey*, 923 F.2d 1217 (6th Cir.1991), to support its argument that the prosecutor can introduce "tools of the drug trade" to help prove intent to distribute. *Rey*, however, concerned a controlled delivery of cocaine and the execution of a search warrant. In the process of executing the warrant, agents found various electronic equipment, often used by drug dealers, in the defendant's apartment. The defendant was charged with possession of cocaine with intent to distribute. The district court received the electronic equipment into evidence to help prove the "intent to distribute" portion of the charge. This court affirmed, stating that "the items in question are not of a type to inflame the jury. Such neutral items are not likely to suggest a decision on an improper basis to a jury. Although the evidence may be damaging to the defendant's case, it is not unfairly prejudicial." *Id.* at 1222.

Unlike the electronic equipment in *Rey*, the sawed-off shotgun is not a "neutral" item. It is exactly the type of item that, in a close case, could inflame the jury and suggest a decision on an improper basis. This, however, is not a close case. The government presented overwhelming evidence of Thomas's guilt. The admission of the gun, while unwarranted, was nevertheless harmless. Thus, there is no need to reverse Thomas's conviction.

### C. Drug Quantity

Thomas was convicted of distributing crack and possession of crack with the intent to distribute. The 220 milligrams of crack referenced in Count 1 is not a large enough amount to affect the quantity of drugs for sentencing purposes. The sentence was really based on the quantity of drugs involved in Count 3, 6.32 grams. Thomas argues that the evidence at trial showed that he sold 4.17 grams of crack to the confidential informant and that the other 2.15 grams was for his

own personal use, not for sale. Thus, Thomas contends, the district court erred in adding the 2.15 grams into the calculation of his sentence.

It is "the sentencing judge ... [who] has the prerogative to make a determination of the quantity of drugs involved in the scheme and to sentence accordingly." *United States v. Moreno*, 899 F.2d 465, 473 (6th Cir.1990). A district court's determination of the quantity of drugs used to compute a defendant's sentence is a finding of fact that should not be rejected unless clearly erroneous. *United States v. Wilson*, 954 F.2d 374, 376 (6th Cir.1992). The finding must be supported by a preponderance of the evidence. *United States v. Hodges*, 935 F.2d 766, 774 (6th Cir.), *cert. denied*, 502 U.S. 889, 112 S.Ct. 251, 116 L.Ed.2d 206 *and cert. denied*, 502 U.S. 915, 112 S.Ct. 317, 116 L.Ed.2d 259 (1991).

At the sentencing hearing, the district court stated that "the jury was charged in relation to the six plus grams" and that they returned a verdict of guilty. Accordingly, the court stated that "one can, I think, only assume under the instructions which the court had given them that their finding was that there were the six plus grams, even though the verdict was general in nature rather than specific in regard to that."

We disagree. During the jury instructions, the court read to the jury Count 3 of the indictment, which charges Thomas with possession of 6.32 grams of crack with the intent to distribute. In discussing the elements of the crime, however, the district court only stated that Thomas need only have possessed a "detectable amount" of crack. The jury's verdict did not make reference to crack quantities. Under the jury instructions, they could have convicted Thomas on Count 3 even if they thought he intended to distribute only 4.17 grams rather than the full 6.32 grams.

Despite this disagreement with the district court, we do not think the sentence is improper. Special Agent Karen McKenna's testimony at trial constitutes the necessary preponderance of the evidence to hold Thomas responsible for 6.32 grams. On cross-

examination, Agent McKenna testified that Thomas told her the 2.15 grams was for his own personal use. On redirect, however, Agent McKenna testified that she had arrested hundreds of crack users and that, in her experience, a mere user would never have this much (2.15 grams) crack. Only dealers would have this much crack at one time.

Agent McKenna's testimony is sufficient evidence to hold Thomas responsible for all 6.32 grams. Thomas has not shown that the district court was clearly erroneous in holding him responsible for 6.32 grams. We, therefore, affirm the district court on this issue.

### D. Failure to Depart Downward

■ Prior to sentencing, Thomas filed a motion for a downward departure pursuant to U.S.S.G. § 5K2.0. That section provides for a departure when circumstances exist that were not given adequate consideration by the Sentencing Commission. Thomas's motion was based on the fact that he is HIV positive, although he has not yet developed AIDS. Using statistics and study reports, Thomas argues that he has approximately 5.8 years left to live. Thomas was sentenced to 110 months in prison. For the normal black male Thomas's age, that sentence represents 31% of his life expectancy. For Thomas, however, the sentence represents almost 200% of his life expectancy. Thomas also points out that, while he is in prison, he is likely to move into the opportunistic infection stage of his disease. Thus, it will cost the government more to incarcerate him than the average prisoner. According to Thomas, these statistics are only recently coming to light, and, therefore, could not have been adequately considered by the Sentencing Commission.

The first question this court must address is whether we have jurisdiction to review the district court's denial of Thomas's motion. Where the district court " 'was not unaware of its discretion to depart from the guideline range, and the sentence was not imposed in violation of law or as a result of an incorrect application of the guidelines, the failure to depart is not cognizable on appeal....' "

*United States v. Hamilton*, 949 F.2d 190, 192 (6th Cir.1991) (citation omitted).

■ This, we think, presents a close question. A district court's decision that the guidelines adequately account for someone who is HIV positive is a question of interpretation, which this court reviews *de novo.* Whether or not such a departure is appropriate under the facts of a given case, however, is a matter within the district court's discretion, and we do not review a refusal to depart when the court is aware of its discretion to do so. We cannot tell, however, from what the district judge stated on the record, whether he thought he was prohibited from departing or whether he exercised his discretion not to depart. Consequently, we shall err on the side of caution and review the district court's decision.

The key issue is whether the Sentencing Commission adequately considered the impact, proportionately speaking, of the sentencing guidelines on persons who are HIV positive. While Thomas is correct that many of the statistics concerning the life expectancies of people who are HIV positive, as well as the cost of caring for those people, are only recently becoming known, the guidelines did consider whether the physical condition of a defendant should be a factor in sentencing:

> Physical condition or appearance, including physique, is not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range. However, an extraordinary physical impairment may be a reason to impose a sentence below the applicable guideline range; *e.g.,* in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment.

U.S.S.G. § 5H1.4.

A district court in Virginia has issued a well-reasoned statement discussing the relationship between this provision and a defendant with AIDS:

> Defendant seeks a downward departure on two grounds. First, defendant claims that his physical condition—he suffers from AIDS—warrants a downward depar-

ture.... Defendant's AIDS affliction warrants sympathy, but not a departure. U.S.S.G. § 5H1.4 provides that "[p]hysical condition is not ordinarily relevant in determining whether a sentence should be outside the guidelines...." Only an "extraordinary physical impairment" may justify a sentence other than imprisonment. *Id.* AIDS is not such a "physical impairment"; nor is cancer or various other terminal or life threatening conditions.... The Bureau of Prisons ... has the medical personnel and facilities required to furnish defendant with the care and treatment he needs. Indeed, defendant is entitled to that care and treatment.... Similarly, Bureau of Prisons medical personnel and facilities ... are also fully competent to give defendant the psychological counselling he needs. In sum, defendant's physical condition, while lamentable, is no basis for a departure.... Except in extraordinary circumstances not present here, terminally ill persons who commit serious crimes may not use their affliction to escape prison. Were this rule otherwise, the law's deterrent effect would be unreasonably and unnecessarily diminished in the case of terminally ill persons.

*United States v. DePew,* 751 F.Supp. 1195, 1199 (E.D.Va.1990), *aff'd on other grounds,* 932 F.2d 324 (4th Cir.1991), *cert. denied,* 502 U.S. 873, 112 S.Ct. 210, 116 L.Ed.2d 169 (1991).

 We agree with what was said in *DePew;* Thomas would only be entitled to a departure if his HIV had progressed into advanced AIDS, and then only if his health was such that it could be termed as an "extraordinary physical impairment." The record shows that Thomas is still in relatively good health. Accordingly, the district court was correct in not departing under these circumstances.

**E. Constitutionality of the Guidelines**

 Thomas argues that the sentencing guidelines adopt a policy of simple uniformity. According to Thomas, this uniformity violates the Sixth and Fourteenth Amendments by creating disparity and dispropor-

tionate sentences, which trial courts may no longer correct.

Review of Thomas's arguments on this issue is hampered by his failure to enunciate reasons to support his contentions and his failure to provide citations to authority. Most of Thomas's arguments, however, were disposed of by the Supreme Court in *Mistretta v. United States,* 488 U.S. 361, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989), and by this court in *United States v. Allen,* 873 F.2d 963 (6th Cir.1989). *Mistretta* held that the Sentencing Reform Act was not an unconstitutional delegation of legislative authority and that it and the sentencing guidelines do not violate the constitutional principle of separation of powers. *Allen* held that there is no constitutional right to individualized sentencing.

 Thomas might also be arguing that his sentence is so disproportionate as to violate the cruel and unusual punishment clause of the Eighth Amendment. This argument cannot succeed. Federal courts will not engage in a proportionality analysis except in cases where the penalty imposed is death or life in prison without possibility of parole. *See Solem v. Helm,* 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983); *Rummel v. Estelle,* 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980); *United States v. Dumas,* 934 F.2d 1387 (6th Cir.1990).

We see no constitutional violation here, and thus affirm the district court's decision.

**III.**

The judgment of conviction and the sentence are **AFFIRMED.**

NATHANIEL R. JONES, Circuit Judge, dissenting.

The majority finds that Thomas was brought to trial in a timely manner that was not in violation of the Speedy Trial Act. I dissent.

I agree with the majority that Thomas was not brought to trial within seventy days as required by 18 U.S.C. § 3161, and thus to show that there has been no violation of the Speedy Trial Act the government must establish that the ninety-day clock of section 3164 applies. Unlike the majority, however,

I do not find that the government has met this burden. The plain language of sections 3161 and 3164 convinces me that section 3164 does not apply to this case. Consequently, I would find that the more than seventy-day delay in bringing Thomas to trial was a violation of the Speedy Trial Act. I would thus remand the case to the district court with instructions to dismiss the indictment.

Section 3161 instructs that "[*i*]*n any case* in which a plea of not guilty is entered, the trial of a defendant ... shall commence within *seventy days* from the filing date." 18 U.S.C. § 3161(c) (1988) (emphasis added). Any case means any case. Thomas entered a plea of not guilty, thus the language of section 3161 clearly applies to him. "The task of resolving the dispute over the meaning of [a statute] begins where all such inquiries must begin: with the language of the statute itself. In this case it is also where the inquiry should end, for where, as here, the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.'" *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989) (quoting *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917)) (citations omitted). The plain language of section 3161 creates the definite presumption that a seventy-day clock should be applied to Defendant Thomas; this court's task is simply to enforce that language.

The majority found that the ninety-day clock of section 3164 applied to this case. Because I find that application of section 3164 creates an absurd result, I would decline to apply it in this case. Section 3164 instructs that the trials of defendants who fall within its scope are to be "accorded priority." Nevertheless, application of section 3164's ninety-day time limit, in juxtaposition with section 3161's seventy-day time limit, encourages that defendants who section 3164 instructs are to be "accorded priority" actually be brought to trial *later* than other defendants. To require defendants who were originally the focus of congressional concern to be treated more harshly than others who were previously afforded no such special protection is nonsensical and thus cannot be a right result. "Courts are bound to construe a statute to avoid absurd results...." *Bailey v. City of Lawrence, Ind.*, 972 F.2d 1447, 1452 (7th Cir.1992). *See also Public Citizen v. United States Dep't of Justice*, 491 U.S. 440, 454–55, 109 S.Ct. 2558, 2567, 105 L.Ed.2d 377 (1989) ("Where the literal reading of a statutory term would 'compel an odd result,' *Green v. Bock Laundry Machine Co.*, 490 U.S. 504, 509, 109 S.Ct. 1981, 1984, 104 L.Ed.2d 557 (1989), we must search for other evidence of congressional intent to lend the term its proper scope."); *Grand ex rel. United States v. Northrop Corp.*, 811 F.Supp. 333, 335 (S.D.Ohio 1992) ("a court should not enforce the plain meaning of a statute if it would lead to an absurd or odd result"). In the absence of a legislative explanation for this odd effect, I believe that the only fair result is to reject the application of the ninety-day clock of section 3164 in this case.

Moreover, I am also troubled by the majority's application of the plain language of section 3164 to the facts of this case. Even if one reads section 3164 as creating a legitimate exception to the plain language of section 3161, the facts of this case strongly suggest that Thomas does not fit within that exception. The provisions of section 3164 apply when a defendant is "being held in detention *solely* because he is awaiting trial." 18 U.S.C. § 3164(a)(1) (emphasis added). The majority found that "for all intents and purposes" Thomas was in custody solely awaiting trial. I believe that the facts show otherwise.

On February 3, 1993, Thomas was taken into federal custody on the narcotics charges involved in the instant case. *See* J.A. at 77. Previously, on January 20, 1993, the day before the federal grand jury returned an indictment against Thomas, the California Interstate Parole Unit lodged a detainer for Thomas' confinement. J.A. at 84. In 1985, Thomas had been convicted in California for voluntary manslaughter and possession of a deadly weapon. He was sentenced to 13 years and paroled on September 26, 1991. Presumably, the January 20th detainer was premised upon the fact that Thomas' instant misconduct was a violation of his parole. Re-

gardless of the purpose of the detainer, section 3164 applies only where a defendant is being held solely because he is awaiting trial. The lodging of the detainer suggests that Thomas was not being held solely for the purpose of awaiting trial. Consequently, he does not fall within the scope of section 3164, and the section's provisions do not apply.

The majority's decision in this case is another of those recurring instances of recent time, where courts are all too-ready to relax the requirements imposed on the government, while shifting the goal posts for individual defendants. I continue to hold to the view, some may consider outdated, that such a double standard is antithetical to the values we hold dear in our constitutional jurisprudence.

Both the plain language and the spirit of section 3164 prohibit its application in the instant case. It is thus inappropriate for this court to use that section to justify the clear violation of section 3161 that has occurred. Thomas was tried more than seventy days after he was arraigned; thus, the Speedy Trial Act was violated. Accordingly, I dissent.