65 F.3d 169
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Jerald POE, Defendant-Appellant.
 No. 94-6482.
 United States Court of Appeals, Sixth Circuit.
 Sept. 5, 1995.
 
 Before: JONES, GUY, and BOGGS, Circuit Judges.
 PER CURIAM.
 
 
 1
 A jury found the defendant, Jerald Poe, guilty of possessing and possessing with intent to distribute methamphetamine, as well as possessing three firearms with obliterated serial numbers. Poe does not contest these convictions, and on appeal raises only issues relating to his sentence. Specifically, Poe contends that the court erred in converting cash found at the time of his arrest into an estimated quantity of methamphetamine. He also argues that the trial judge erred in using the Drug Equivalency Tables to calculate the quantity of drugs to be used in computing his base offense level.
 
 
 2
 After reviewing the record, we conclude that no errors occurred and affirm the sentence imposed.
 
 I.
 
 3
 A cooperating individual (CI) made two purchases of methamphetamine from the defendant, the first occurring on May 25, 1994, and the second on June 1, 1994. In connection with these purchases, the CI also engaged in several recorded conversations with the defendant concerning methamphetamine. Before purchasing methamphetamine from the defendant, the CI had previously purchased methamphetamine from defendant's son.
 
 
 4
 On June 10, 1994, a state search warrant authorizing a search of defendant's residence was executed. Among the items seized were $14,900 found inside a tennis shoe in defendant's bedroom, $4000 hidden in an end table, a pistol with an obliterated serial number found in a lock box under the bed, and $73,000 in cash and a set of electronic scales found hidden behind a false cabinet wall in the dining room.
 
 
 5
 Pursuant to the search warrant, the officers also searched the barn adjacent to the house, which was the location of one of the methamphetamine sales to the CI. In a locked room, the officers found a cabinet with a false bottom, within which was found several baggies, rubber gloves, a plastic cup containing methamphetamine residue, and two syringes. The officers also seized a .22 caliber semi-automatic handgun with an obliterated serial number from defendant's truck, which was parked on the premises.
 
 
 6
 The defendant was not arrested at this time, but was arrested on June 23, 1994, at an Econo-Lodge Motel in Manchester, Tennessee. At the time of the arrest, officers seized a black briefcase containing approximately $40,000 in cash, as well as a set of electronic scales, from a vehicle that the defendant was driving. The defendant admitted the money belonged to him.
 
 
 7
 A search of defendant's person revealed a motel key for a room at the Best Western Motel in Manchester, Tennessee. Poe executed a written consent, enabling the officers to search that motel room. During the search, the officers found a small amount of methamphetamine inside the pocket of a man's shirt hanging in the closet and a 9mm pistol with the serial number ground off. The shirt size was that which would be worn by a person with the defendant's build.
 
 
 8
 At the sentencing hearing, after the defendant was tried and convicted, the government produced additional evidence relevant to the methamphetamine seized. This evidence consisted of a laboratory analysis that showed that the methamphetamine from the May 25, 1994, sale was 81 percent pure and weighed 23.3 grams, and the methamphetamine from the June 1, 1994, sale weighed 70.9 grams and was 78 percent pure. The weight of the methamphetamine found in the shirt pocket was 10.2 grams, but there was no analysis offered as to its purity.
 
 
 9
 For the purposes of sentencing, the court then reached the following conclusions, which it placed upon the record:
 
 
 10
 THE COURT: .... I calculate the drug quantities, quantity in the following manner: The first item is 23.3 grams of methamphetamine that was the subject of the allegations in Count 1 in which the Defendant was convicted, May 25th, 1994 transaction. This methamphetamine was tested by the Drug Enforcement Administration laboratory in Miami, Florida. It tested out at 81 percent pure. It is, therefore, ice as that term is defined in the sentencing guidelines under Section 2D1.1....
 
 
 11
 ....
 
 
 12
 THE COURT: .... So, therefore you convert that 23.3 grams to marijuana, which we have to do in this case, because we have differing quantities, differing amounts seized at differing times calculated in differing ways depending upon their purity. We get 233 kilograms of marijuana.
 
 
 13
 The next part of the calculation is to calculate methamphetamine involved in Count 2, which is the June 1st, 1994 transaction on which the Defendant was convicted.
 
 
 14
 That is 70.9 grams of methamphetamine which according to the DEA report is 78 percent pure. 78 percent of 70.9 is 55.3. Therefore, the June 1st methamphetamine translates out and can be converted to 553 kilograms--553 kilograms of marijuana.
 
 
 15
 Next, the court is utilizing the 10.2 grams of methamphetamine which was seized in connection with Count 6 in the motel room on June 23rd, 1994. That marijuana or that methamphetamine was not tested. Therefore, we do not know its purity. Therefore, we just call it 10.20 kilograms of marijuana.
 
 
 16
 (App. 205-06.)
 
 
 17
 After explaining its calculations relative to the drug quantities themselves, the court went on to explain why and in what amount it was converting some of the cash found into drug quantities.
 
 
 18
 [THE COURT]: The court will also use in calculating the drug quantity here pursuant to application note 12 a certain part of the cash that's been involved in this case. Because of the conflict in the proof regarding the cash found in the house, I'm not going to use any of the cash found in the house, although I think it's certainly possible that some of that cash might be used and I think it could be found beyond a reasonable doubt that some of that cash, particularly the 73,000 amount, was utilized in connection with drug transactions, obtained in connection with drug transactions. I'm nevertheless not going to use that.
 
 
 19
 I am going to use, however, the cash that was seized in the Defendant's truck at the time he was apprehended on June 23rd, which is $40,191. Utilizing that amount pursuant to application note 12 of Section 2D1.1, because first I'm convinced that the amount of methamphetamine seized either at that time or on all the other occasions does not reflect the scale of the offense.
 
 
 20
 I will point out that I believe that this money found in the truck definitely was, to use for lack of a better term, drug money, because scales were found in the truck weighing out the drugs, methamphetamine was found in the shirt pocket back in the motel room. The cash quantity was great, in other words, not just your walking around money, but it's $40,000 plus. And, of course, the Defendant had the key to the motel room, which therefore he had access to his clothes that were in the motel room and also the small amount of methamphetamine that was in the motel room, plus there was a pistol found in the motel room, another indication of drug activity, dealing.
 
 
 21
 So, when you utilize the $40,191, divide that by 1200, which is the amount per ounce that he was getting for it, you get 33.49 ounces, which converts to 949.11 grams, which converts to 949.11 kilograms of marijuana.
 
 
 22
 You add it all together, you get 1,745.31 kilograms of marijuana. When you look that up in the drug table, you get a base offense level of 32. So, I find that the base offense level in the case is 32, as opposed to I think 34, which was utilized in the presentence report.
 
 
 23
 (App. 206-08.)
 
 II.
 
 24
 We address first defendant's contention that the court erred in treating the money found in the defendant's automobile at the time of his arrest as the equivalent of an estimated quantity of methamphetamine. The defendant concedes that the sentencing guidelines allow a conversion of cash into drug quantities for the purposes of sentencing, and contests only the court's finding that the possession of the currency was "part of the same course of conduct or common scheme or plan as the offense of conviction." See U.S.S.G. Sec. 1B1.3(a)(2). We review the district court's determination that the cash recovered from the defendant at the time of his arrest represented proceeds from the defendant's methamphetamine activities for clear error. United States v. Thomas, 49 F.3d 253, 259 (6th Cir.1995). Applying this standard of review, we conclude that it was entirely appropriate for the court to consider the $40,000 seized at the time of defendant's arrest.[1] As the trial judge pointed out, this money found in conjunction with other drug paraphernalia by an individual principally engaged in the business of selling methamphetamine, provided an ample basis for the court to conclude that this was drug money. In reality, at the time of the sentencing hearing the defendant really offered no alternative explanation as to the source of this money, relating what proofs he did offer primarily to the amounts of money found in his house at the time the search warrant was executed. We agree with the factual conclusions reached by the trial judge in this regard.
 
 III.
 
 25
 We turn now to defendant's argument that it was error to utilize the Drug Equivalency Tables in calculating the quantity of drugs to be used in computing defendant's base offense level. In support of this contention, defendant argues that when the only controlled substance involved is a single drug, it is inappropriate to use the Drug Equivalency Tables. See United States v. Paz, 927 F.2d 176, 180 (4th Cir.1991). We need not discuss the legal authority defendant relies upon for this proposition, because we find that his factual premises, i.e., that only one drug was involved, is incorrect.
 
 
 26
 In determining an appropriate sentence in a drug offense, a defendant's base offense level for a violation of Title 21 U.S.C. Sec. 841(a)(1) is determined by computing the quantity of drugs involved in the offense. U.S.S.G. Sec. 2D1.1(c). If more than one controlled substance is involved, the sentencing guidelines direct that the Drug Equivalency Tables set forth in U.S.S.G. Sec. 2D1.1, comment. (n. 10), should be used to determine the appropriate offense level. The guidelines counsel, in their relevant commentary:
 
 
 27
 The Drug Equivalency Tables also provide a means for combining differing controlled substances to obtain a single offense level. In each case, convert each of the drugs to its marihuana equivalent, add the quantities, and look up the total in the Drug Quantity Table to obtain the combined offense level.
 
 
 28
 U.S.S.G. Sec. 2D1.1, comment. (n. 10).
 
 
 29
 As the district judge pointed out at the time of sentencing, the methamphetamine sold by the defendant on May 25, 1994, was determined to be "ice." The methamphetamine sold on June 1, 1994, was correctly determined to be "methamphetamine (actual)." Finally, because there had been no laboratory analysis of the purity of the 10.2 grams found in the motel room, there was no basis for the district court to treat this substance as either "ice" or "methamphetamine (actual)," and, therefore, the conversion rate for standard "methamphetamine" applied. We reject defendant's contention that, even though three different forms of methamphetamine were involved, they should all be treated as simply methamphetamine. Contrary to defendant's claim in this regard, the Drug Equivalency Tables found in U.S.S.G. Sec. 2D1.1, comment. (n. 10), reference three different types of methamphetamine and treat them differently. Similarly, these tables list different types of methamphetamine and set forth different conversion amounts for each type. For example, the guidelines direct that "ice" and "methamphetamine (actual)" must be calculated at ten times the rate of "simple methamphetamine" for conversion purposes. It is thus necessary to convert these three different forms of methamphetamine into their marijuana equivalent, as is provided for in the Drug Equivalency Tables to determine a base offense level. We fully concur with the methodology used by the district court in computing defendant's base offense level.
 
 
 30
 We also find that our prior determination that the court correctly converted the $40,000 found in defendant's vehicle into drug quantities makes it unnecessary for us to consider the issue of whether the court correctly used the Drug Equivalency Tables. The court determined that over one kilogram of methamphetamine was involved, and this amount of methamphetamine, without regard to the Drug Equivalency Tables, would provide for a base offense level of 32, the same base offense level computed by the court.
 
 
 31
 Finding that the trial court carefully and correctly computed defendant's base offense level, we AFFIRM.
 
 
 
 [1]
 The court erred on the side of caution in converting cash into drug equivalencies. The court also could have considered the money found in defendant's residence at the time the search warrant was executed. The defendant attempted to attribute the source of this money to a 1989 insurance settlement and some legitimate business income, but the manner in which the money was kept, the lack of any documentation as to legitimate business income, and the fact that his wife professed no knowledge of the money, would have enabled the district judge to find by a preponderance of the evidence that the money was drug-related